# 19cv6524

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

**KARIN WOLF; D AND G** (by their mother, natural
guardian, and next friend KARIN WOLF),

          Plaintiffs,

    v.

Case no:

**STATE OF NEW JERSEY;**
**COUNTY OF BERGEN;**
**BERGEN COUNTY SUPERIOR COURT;**
**ADMINISTRATIVE OFFICE OF THE COURTS;**
**GLENN A. GRANT, J.A.D.,**
  individually and in his official capacity as Acting
  Administrative Director of the New Jersey Courts;
**DAVID TANG,**
  individually and in his official capacity as Chief of
  the Family Practice Division;
**LAURA SIMOLDONI,**
  individually and in her official capacity as Trial Court
  Administrator of the Bergen County Superior Court;
**ARTHUR ANDREANO,**
  individually and in his official capacity as Operations
  Manager of the Bergen County Superior Court;
**JUDGE PETER J. MELCHIONNE,**
  individually and in his official capacity as
  Judge of the Bergen County Superior Court;
**DEPARTMENT OF CHILDREN**
 **AND FAMILIES (DCF);**
**DIVISION OF CHILD PROTECTION**
**AND PERMANENCY (DCPP);**
**KARI FERRARE,**
  individually and in her capacity as
  social worker at DCPP;
**LYDIA TATEKAWA,**
  individually and in her capacity as
  Adoption Supervisor at DCPP;
**DR. ALLWYN J. LEVINE,**
  individually and in his professional capacity;
**VALERIE SOLIMANO, ESQ.,**
  individually and in her capacity as
  an Officer of the Court;

**COMPLAINT**

**JURY DEMAND**

1

| | |
|---|---|
| **JAY ATKINS, ESQ.,**<br> individually and in his capacity as<br> an Officer of the Court;<br> **LUCIANA COUTINHO-CRANE,** | )<br>)<br>)<br>)<br>) |
| Defendants. | )<br>) |

-------------------------------------------------------------------X

## INTRODUCTION

1.  Karin Wolf, an individual with Post-Traumatic Stress Disorder (PTSD) and Chronic
    Asthma, and regarded as having a disability; and her minor child D; and her minor child
    G, an individual with Scoliosis and PTSD (collectively, "Plaintiffs"); bring this complaint
    against the State of New Jersey; County of Bergen; Bergen County Superior Court;
    Administrative Office of the Courts; Glenn A. Grant, J.A.D.; David Tang; Laura
    Simoldoni; Arthur Andreano; Judge Peter J. Melchionne; Department of Children and
    Families; Division of Child Protection and Permanency (DCPP); Kari Ferrare; Lydia
    Tatekawa; Dr. Allwyn Levine; Valerie Solimano, Esq., Jay Atkins, Esq.; and Luciana
    Coutinho-Crane (collectively, "Defendants"), all of whom are public and/or private
    entities.

2.  Since at least April 2018, under color of law, Defendants have refused to provide Plaintiff
    Karin Wolf with individualized treatment; and disability accommodations and
    modifications necessary to ensure full and equal access court proceedings to which Ms.
    Wolf's parental rights and children's custody/guardianship are at issue.

3.  Defendants have also stigmatized Ms. Wolf with mental health impairments she does not
    have.  Defendants discriminated against Plaintiffs according to these perceived mental
    impairments, which are largely disproportionately used against women.  Defendants
    acted on related assumptions and stereotypes on the basis of sex/gender and status.

4.   Moreover, Defendants retaliated against Karin Wolf as a whistleblower and exploited Plaintiffs' disabilities for profit.  These discriminatory acts continue through present.

5.   As a result, Plaintiffs have suffered a punitive death to the parent-child relationship and loss of consortium with other family members.  Defendants have denied Plaintiffs the right to be a family, and threatens to deny them that opportunity permanently, when there is no finding of abuse or neglect against the mother, who is the sole surviving parent.

6.   Also as a result, Plaintiff Karin Wolf was arrested and incarcerated for 30 days, which caused further harm to her, worsening her PTSD and causing physical damage.

7.   In August 2015, the USDOJ published a technical assistance manual stating: "Both the HHS Office for Civil Rights (OCR) and DOJ Civil Rights Division have **received numerous complaints of discrimination** from individuals with disabilities involved with the child welfare system, and the **frequency of such complaints is rising**. In the course of their civil rights enforcement activities, OCR and DOJ have found that child welfare agencies and courts vary in the extent to which they have implemented policies, practices, and procedures to prevent discrimination against parents and prospective parents with disabilities in the child welfare system."

8.   Defendants' actions, inactions, and omissions here violate Title II of the Americans with Disabilities Act, as amended, and per the Final Rule ("ADA") at 42 U.S.C. §§ 12131-12134, and its implementing regulation, 28 C.F.R. Part 35; and Title III of the ADA at 42 U.S.C. § 12181 *et seq.*, and its implementing regulation at 28 C.F.R. Part 36; and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

9.   Defendants have no immunity pursuant to 42 U.S.C. § 12202.

10.   Plaintiffs do not challenge or appeal a State court decision.

11.   This matter raises the issue of mass incarceration in the United States.

12.   This matter raises an issue of general public importance.

13.   The United States has an interest herein.

## FEDERAL QUESTION

14.   Fundamentally at issue is the constitutional balance between a sole surviving parent's rights to her children and privacy, versus efforts of the State to render services, but in a way that does not harass, exploit, or turn the intended beneficiaries into victims or criminals.

15.   Also at issue here is whether a U.S. citizen is eligible for U.S. political asylum from a State of the United States.

16.   Also at issue here is whether a layperson can be held in violation of the ADA and Section 504 when that layperson uses a public or private entity to discriminate intentionally against a qualified individual with a disability.

17.   Under FRCP 5.1, Plaintiffs bring a constitutional challenge to N.J.S.A. 9:2-5; and N.J.S.A. 30:4C-12 et seq. (Title 30, aka "Permanency"), based off the Adoption and Safe Families Act (ASFA).

18.   Plaintiffs argue that their rights under the 1st, 4th, 5th, 8th, 9th and 14th amendments, have been violated here.

19.   Plaintiffs also invoke the federal anti-injunction statute to protect its judgments.

## JURISDICTION AND VENUE

20.   This Court has jurisdiction of this action under 28 U.S.C. § 1331, and 42 U.S.C. §§ 12133 and 12188.  The Court may grant declaratory and other relief pursuant to 28 U.S.C. §§ 2201 and 2202.

4

21. The U.S. Supreme Court may have jurisdiction over this matter pursuant to 28 U.S.C. § 1251.Original jurisdiction.

22. The Court may grant attorney's fees pursuant to 42 U.S.C. § 12205.

23. The acts and omissions of Defendants giving rise to this action occurred in New York City; Westchester County, NY; New Jersey; North Carolina; Virginia; and Connecticut. Plaintiffs were situated and aggrieved in this district, and suffered multiple losses in this district, during the events giving rise to this action, including present unmitigated harm, making venue proper in Southern District of New York pursuant to 28 U.S.C. § 1391.

24. Plaintiff Karin Wolf is not filing this in the District of New Jersey because it is *forum non conveniens* for Ms. Wolf's PTSD communication disability. The Southern District of New York provides communication tools, auxiliary aids and services that accommodate Ms. Wolf's PTSD, such as NYLAG legal help and electronic filing (NextGen ECF). These services are unavailable in the District of New Jersey.

25. Moreover, Ms. Wolf continues to experience disability-based discrimination, hostility and retaliation in New Jersey.

26. Enforcement by the United States Attorney General is invoked pursuant to 42 U.S.C. §§ 12133 and 12188.

### THE PARTIES

27. Plaintiff, Karin Wolf, lives in Westchester County (Address Confidentiality Program of the State of New York), and works in New York City, during the events herein.

28. Plaintiffs, D and G, are two teenaged minors and individuals who are the children of Karin Wolf. Their domicile follows that of their mother Karin Wolf. Their father is deceased.

29.   Defendant, State of New Jersey, is responsible for the administration of its respective departments, agencies, the Judicial Branch of New Jersey and other instrumentalities. This action concerns the administration of the Bergen County Superior Court, the AOC, DCF, DCPP, and persons licensed to do business in the state. The State of New Jersey is a recipient of federal financial assistance. Serve on: Christopher S. Porrino, New Jersey Attorney General, Richard J. Hughes Justice Complex, 25 Market Street, Trenton, New Jersey 08625.

30.   Defendant, County of Bergen, is responsible for the administration of its respective departments, agencies, the Bergen County Judiciary Court System, and other instrumentalities. It is a recipient of federal financial assistance. Serve on: Office of the County Counsel, One Bergen County Plaza, Room 580, Hackensack, NJ 07601-7076.

31.   Defendant, Bergen County Superior Court exercises jurisdiction of all civil matters filed in Bergen County, including family law and juvenile cases, and administers all these cases and the court's activities in these cases. It is a recipient of federal financial assistance. It is located at 10 Main Street, Hackensack, NJ 07601.

32.   Defendant, Administrative Office of the Courts, assists the Chief Justice, and Superior and Supreme Courts of New Jersey in their leadership role as the administrators and managers of New Jersey's judicial system, its courts, officers, and related offices and programs. It is a recipient of federal financial assistance. It is located at Richard J. Hughes Justice Complex, 25 Market St, Trenton, New Jersey 08625.

33.   Defendant, Glenn A. Grant, J.A.D., is the Acting Administrative Director of the New Jersey Courts. He is being sued individually and in his official capacity. He is located at Richard J. Hughes Justice Complex, 25 Market St, Trenton, New Jersey 08625.

34.    Defendant, David Tang, is the Chief of the Family Practice Division. He is being sued individually and in his official capacity. He is located at Richard J. Hughes Justice Complex, 25 Market St, Trenton, New Jersey 08625.

35.    Defendant, Laura Simoldoni, is the Trial Court Administrator of the Bergen County Superior Court. She is being sued individually and in her official capacity. She is located at 10 Main Street, Hackensack, NJ 07601.

36.    Defendant, Arthur Andreano, is the Operations Manager of the Bergen County Superior Court. He is being sued individually and in his official capacity. He is located at 10 Main Street, Hackensack, NJ 07601.

37.    Defendant, Judge Peter J. Melchionne, is the Presiding Judge of the Family Division of the Bergen County Superior Court. He is being sued individually and in his official capacity. He is located at 10 Main Street, Hackensack, NJ 07601.

38.    Defendant, New Jersey Department of Children and Families ("DCF"), is a New Jersey state agency responsible for Division of Child Protection and Permanency ("DCPP"). It is a recipient of federal financial assistance. It is located at 50 E State St., Trenton, NJ 08608.

39.    Defendant, Division of Child Protection and Permanency ("DCPP"), Bergen County Office is New Jersey's child protection and child welfare agency within the Department of Children and Families. It is a recipient of federal financial assistance. It is located at 240 Frisch Court, 2nd Floor, Paramus, NJ  07652.

40.    Defendant, Kari Ferrare, is an investigative social worker at DCPP. She is being sued individually and in her professional capacity. She is located at 240 Frisch Court, 2nd Floor, Paramus, NJ  07652.

7

41.     Defendant, Lydia Tatekawa, is an Adoption Supervisor at DCPP.  She is being sued individually and in her professional capacity.  She is located at 240 Frisch Court, 2nd Floor, Paramus, NJ  07652.

42.     Defendant, Dr. Allwyn J. Levine is an independent mental health provider licensed by the State of New Jersey.  He is a "private entity" within the meaning of 42 U.S.C. § 12181 and its implementing regulation.  He is a recipient of federal financial assistance.  He is being sued individually and in his professional capacity.  He is located at 179 S Maple Ave, Ridgewood, NJ 07450.

43.     Defendant, Valerie Solimano, Esq., is an attorney licensed in the State of New Jersey.  She is being sued individually and in her professional capacity as an Officer of the Court.  She is located at 21 Main St # 151, Hackensack, NJ 07601.

44.     Defendant, Jay Atkins, Esq., is an attorney licensed in the State of New Jersey.  He is being sued individually and in his professional capacity as an Officer of the Court.  He is located at 887 Kinderkamack Rd #3, River Edge, NJ 07661.

45.     Defendant, Luciana Coutinho-Crane, is an individual acting in concert with the public and private entities named as defendants herein.  She is located at 5 Rock Road, Glen Rock, NJ 07452.

**FACTS**

46.     Plaintiff Karin Wolf is an individual with Post-Traumatic Stress Disorder (PTSD) and chronic Asthma.

47.     At a minimum, Ms. Wolf is substantially limited in her ability to communicate and access the Bergen County Court System, given the adversarial history there which caused her to develop PTSD.  Ms. Wolf also has difficulty breathing, exacerbated by the PTSD.

48. Ms. Wolf is regarded by the Defendants as having other mental impairments such as Bipolar Disorder (which Ms. Wolf does not have).

49. Karin Wolf is a qualified individual within the meaning of 42 U.S.C. §§ 12102 and 12131(2).

50. Karin Wolf is a natural female and biological mother of D and G, minors.

51. G is an individual with Scoliosis and Post-Traumatic Stress Disorder (PTSD).

52. G is a qualified individual within the meaning of 42 U.S.C. §§ 12102 and 12131(2).

53. Karin Wolf is a defendant in *Luciana Coutinho-Crane v. Karin Wolf and Edward Crane*, Bergen Court Case No. FD-02-37-18.

54. Karin Wolf is a defendant in *New Jersey Division of Child Protection and Permanency v. Karin Wolf, Luciana Coutinho-Crane, and Edward Crane (deceased)*, Bergen Court Case No. FN-02-68-19.

55. Karin Wolf is a defendant in *State of New Jersey v. Karin Wolf*, Bergen Court Case/Complaint No. W-2018-000077-0222.

56. At no time did the Bergen County Superior Court provide Ms. Wolf with disability accommodations and modifications necessary for her court appearances and related matters.

57. As a result, Ms. Wolf could not fully and equally participate in the proceedings.

58. As a result, Ms. Wolf and her children lost precious time together and Ms. Wolf has not been able to parent her children.

59. As a result, Ms. Wolf's parental rights have been effectively terminated and are threatened with official termination by the State.

60. Defendants caused Plaintiff Karin Wolf's PTSD.

61.   Ms. Wolf documented her disability with the court in 2013.

62.   In 2017, Ms. Wolf sued the some of the Defendants named herein for violating the ADA.

63.   Ms. Wolf has blogged and posted on social media about family court corruption in the State of New Jersey; and participated in related political protests, which renders her *persona non grata* in the Bergen Court.

64.   In the fall of 2017, G's father, Edward Crane, was diagnosed with stomach cancer and was subsequently hospitalized from early February - April 2018 at New York Presbyterian Hospital in New York City, where he died; accordingly, he was a qualified individual with a disability as defined in 42 U.S.C. § 12131 and Plaintiffs are afforded protection under the ADA and 504 by their association with him.

65.   For months, Luciana Coutinho-Crane concealed Mr. Crane's illness, hospitalization, and incapacitation from Karin Wolf, who only learned of it in April 2018.

66.   On April 12, 2018, Ms. Wolf filed an emergent application regarding child custody in the Bergen County Superior Court, requesting a change of venue, citing the ADA, which the court denied.

67.   Immediately, the Bergen Court reassigned Ms. Wolf's case from Judge Jane Gallina-Mecca to Judge Peter J. Melchionne, without explanation, which foreshadows impropriety coming down the pike.

68.   Ms. Wolf advised Judge Melchionne of the Bergen Court and DCPP of her immediate concerns for her children's safety, as her daughter G had reported physical and psychological abuse by her stepmother (Mr. Crane's wife, Luciana Coutinho-Crane).

69.  Coutinho-Crane had hit the child (who has Scoliosis) in her ribs and spine and left bruises on her.  G also reported that the stepmother's father, Plinio Coutinho, kicked her near her spine and exposed both D and G to pornography.  DCPP failed to remedy this.

70.  Ms. Wolf also pointed out that the Bergen Family Court is running an illegal trade organization called NJ-AFCC from within the courthouse, using families for profit.

71.  On April 16, 2018, Edward Crane died, however Ms. Wolf only learned of it almost a week later.  Ms. Wolf became the sole surviving custodial parent.

72.  Moreover, as a citizen of the State New York, the children became domiciled by operation of law with Ms. Wolf in New York. *Matter of Thorne*, 240 N.Y. 444.

73.  Upon learning of Mr. Crane's death, Ms. Wolf tried to retrieve her children, but was blocked by the stepmother, in concert with Kari Ferrare of DCPP.

74.  G told Ms. Ferrare of the physical abuse and neglect she was experiencing at the hands of Luciana Coutinho-Crane and Plinio Coutinho.

75.  G also told DCPP that her brother D, often punched her, encouraged by Coutinho-Crane.

76.  G had outgrown her nighttime back brace, which was several years old and no longer effective in treating her Scoliosis.

77.  Luciana Coutinho-Crane failed to take the child back to the doctor to treat her Scoliosis, and/or take steps necessary to notify Ms. Wolf regarding the child's need for medical attention.  Instead, Ms. Coutinho-Crane chose to conceal Mr. Crane's terminal illness and hospitalization from Ms. Wolf (which was financially motivated).

78.  But more compelling is that Ms. Coutinho-Crane hates G, and is jealous of G, and medically neglected the child with malice.

79. DCPP failed to protect G, as a disabled child with Scoliosis, from physical abuse and medical neglect that has serious implications.

80. As a result, G's spine is damaged.

81. As a result, this caused great anxiety in Ms. Wolf and exacerbated her PTSD.

82. On April 18, 2018, Ms. Wolf made a disability request for accommodations and modifications to Defendant Arthur N. Andreano, the designated responsible employee for processing ADA requests at the Bergen Court.

83. PTSD is an invisible disability and a communication disability.

84. Given her *persona non grata* status with the Bergen Court, Ms. Wolf asked for a change of venue as an accommodation.

85. Ms. Wolf also asked for auxiliary aids and services to accommodate her disability, namely audio recordings and transcripts.

86. Ms. Wolf backed up her request with a letter from her medical physician, stating Ms. Wolf's need for accommodations.

87. The doctor stated the Bergen Court exacerbates Ms. Wolf's conditions and furthers the ongoing trauma; and her PTSD cannot be fully treated until the ongoing trauma ends, and includes that Ms. Wolf's access to her children be restored.

88. Defendant Andreano insisted Ms. Wolf sign a HIPAA release as a condition to getting disability accommodations and modifications.

89. Ms. Wolf called the USDOJ who confirmed that she was not required to sign a HIPAA release, but only document her disability and the need for accommodations; that this is unlawful and violative of the ADA; and advised her to file a complaint.

90.     The Bergen Court then denied Ms. Wolf disability accommodations and modifications
        based on her refusal to sign the release.

91.     As a result, Ms. Wolf could not fully and equally participate in the proceedings.

92.     As a result, this exacerbated Ms. Wolf's PTSD.

93.     The children inherited an estimated two (2) million dollar estate upon their father's death.

94.     It appears Edward Crane left very little or nothing financially to his wife Coutinho-Crane.

95.     Historically, stepparents do not have standing to sue for custody because of obvious
        financial motives and abuses.

96.     On April 24, 2018, without proper notice to Ms. Wolf, Luciana Coutinho-Crane, filed an
        emergent application for custody of Ms. Wolf's children D and G claiming Ms. Wolf was
        unfit and mentally ill, based on Ms. Wolf's political activities and federal lawsuits against
        the State of New Jersey.

97.     Coutinho-Crane attached documents dubiously signed by Edward Crane in 2014.

98.     G stated that her father had had a relapse of cancer and was undergoing chemotherapy
        treatment (which causes brain fog) when those documents were signed, and (effectively)
        that her stepmother had exercised undue influence over G's father Edward Crane.

99.     Judge Melchionne gave sole physical custody, legal custody, and guardianship to the
        stepmother; and appointed Valerie Solimano as a GAL for the children, pursuant to
        N.J.S.A. 9:2-5.  Solimano is associated with NJ-AFCC.

100.    As a result, this exacerbated Ms. Wolf's PTSD.

101.    Moreover, in blatant violation of the 1st Amendment, Judge Melchionne issued a
        politically motivated Gag order against Ms. Wolf.

102.   Moreover, Solimano and Melchionne are purportedly having an affair, and this
       appearance of impropriety is found in their honeyed court demeanor and the fact that
       Melchionne appoints Solimano as GAL on a disproportionately large amount of cases.

103.   N.J.S.A. 9:2-5 is unconstitutional under the 1st, 4th, 5th, 8th, 9th, and 14th amendments:

       9:2-5 - Death of parent having custody; reversion of custody to surviving parent;
       appointment of guardian by superior court; removal -

       In case of the death of the parent to whom the care and custody of the minor
       children shall have been awarded by the Superior Court, or in the case of the
       death of the parent in whose custody the children actually are, when the parents
       have been living separate and no award as to the custody of such children has
       been made, the care and custody of such minor children shall not revert to the
       surviving parent without an order or judgment of the Superior Court to that effect.
       The Superior Court shall have the right, in an action brought by a guardian ad
       litem on behalf of the children, to appoint such friend or other suitable person,
       guardian of such minor children, and shall have the right to remove such
       guardian, and to appoint a new guardian or guardians, and to make such
       judgments and orders, from time to time, as the circumstances of the case and the
       benefit of the children shall require.

104.   N.J.S.A. 9:2-5 is a limbo statute which in effect, automatically makes a child a ward of
       the State upon a custodial parent's death.  It marginalizes the surviving parent and forces
       the them into court, thus the parent is not free from law.

105.   N.J.S.A. 9:2-5 automatically renders the surviving parent an invalid by mandating a
       GAL, which in effect, automatically regards the surviving parent as disabled, and

therefore triggers the ADA.  It forces a contract with the GAL, regardless of the parent's ability to pay.  The parent is not provided with informed consent, nor any GAL guidelines, which triggers the Health Insurance Portability and Accountability Act (HIPAA).

106.    N.J.S.A. 9:2-5 automatically forces a contract between the GAL and the surviving parent, which the family is forced to pay at a typical rate of $350/hr., and is ripe for abuses.

107.    In Ms. Wolf's case, her parental rights were never officially terminated; and her divorce contract with her former husband made Ms. Wolf the custodial parent, contained a 'no adoption' clause, and mandated guardianship to the surviving parent.  That case became *res judicata* and was abated upon Mr. Crane's death.

108.    Moreover, Ms. Wolf is a citizen of New York; the State of New Jersey has no compelling state interest in choosing the children's domicile.

109.    The custody case is a *de facto* adoption, or a DCF case cloaking itself as a "custody" proceeding, without procedural protections in place.

110.    On or around May 7, 2018, Ms. Wolf filed a civilian criminal complaint against Judge Melchionne, Valerie Solimano, and Luciana Coutinho-Crane.

111.    In May 2018, Ms. Wolf hired Barbara Cowen, Esq. to represent her in the custody matter.

112.    After speaking with Valerie Solimano, Ms. Cowen demanded that Ms. Wolf withdraw her request for disability accommodations and modifications.

113.    Ms. Wolf refused in order to preserve her rights.

114.    After speaking with Valerie Solimano, Ms. Cowen demanded that Ms. Wolf withdraw her civilian criminal complaint against Judge Melchionne, Valerie Solimano, and Luciana Coutinho-Crane, threatening to drop her as a client if she didn't.

15

115.    Ms. Wolf refused in order to preserve her rights.

116.    Ms. Cowen demanded that Ms. Wolf pay a $12,000 retainer to a psychologist whom Ms. Cowen chose, and became incensed when Ms. Wolf refused to pay the extortive sum.

117.    Ms. Cowen's representation of Ms. Wolf ended shortly thereafter.

118.    On or about June 22, 2018, Ms. Wolf had a court appearance and a doctor's appointment.

119.    In advance, on June 20, 2018, Ms. Wolf contacted the Court to renew her request for disability accommodations and modifications.

120.    Ms. Wolf  backed up her request with a Declaration and curriculum vitae from Dr. Karin Huffer, a PTSD expert, ADA specialist and advocate, to whom Ms. Wolf had to pay a retainer of $2500 to advocate on her behalf to ensure Ms. Wolf would have equal and effective access to the court proceedings.

121.    In her Declaration, Dr. Huffer advised the court that Ms. Wolf's trauma-related disability is typically misconstrued, and that accommodations would serve court economy and justice.

122.    In her Declaration, Dr. Huffer also stated, "Ms. Wolf requests that the children be returned to her in the interim per the following [ADA and 504] that mandates children not be removed from a parent as a preventive measure or because of a diagnosis......This includes the children's rights to have a normal relationship with their mother."

123.    Defendant Laura Simoldoni, Trial Court Administrator, insisted Ms. Wolf sign a HIPAA release as a condition to getting disability accommodations and modifications.

124.    Again, Ms. Wolf refused to sign the release for privacy reasons and the Bergen Court denied her disability accommodations and modifications, memorializing that in a letter.

125.    As a result, Ms. Wolf could not fully and equally participate in the proceedings.

126.   As a result, this exacerbated Ms. Wolf's PTSD.

127.   Ms. Wolf did not attend Court and went to her medical doctor on June 22, 2018.

128.   Defendant Judge Peter J. Melchionne continued to hold court proceedings and issue orders, without disability accommodations and modifications for Karin Wolf.

129.   G told Valerie Solimano that her stepmother was abusing and neglecting her.

130.   On or around May-June 2018, Valerie Solimano wrote and sent a letter to Judge Melchionne falsely stating the children were doing well in the custody of the stepmother.

131.   G had contacted her mother threatening to run away from her stepmother's house, citing abuse and neglect.  Ms. Wolf became concerned for her daughter's safety, such as ending up a victim of human trafficking.

132.   On or around August 22, 2018, G ran away while on vacation with the stepmother in North Carolina and asked her mother to rescue her.  Ms. Wolf drove to North Carolina, picked up G.

133.   Ms. Wolf and her daughter checked in with the police in Virginia a few hours later.

134.   G told the police she ran away from the stepmother's abuse and the police determined G was safe with her biological mother.  The police removed G from the missing persons alert system and sent Ms. Wolf and her daughter on their way.

135.   Unhappy with this, Coutinho-Crane pursued the matter in New Jersey.

136.   Several days later, Judge Melchionne signed an order requiring Ms. Wolf's arrest.

137.   On or around August 30, 2018, Ms. Wolf was arrested and incarcerated in Connecticut for 30 days; and G was placed into foster care with DCPP.

138.   As a result, this exacerbated Ms. Wolf's PTSD with great impact.

139.  Moreover, New Jersey extradited Ms. Wolf on or around the 30th day, contrary to its own policies of bail reform.  Ms. Wolf was located a mere one-hour drive away.

140.  Ms. Wolf believes this was politically motivated.

141.  Ms. Wolf also suffered physical damage to her tailbone from sleeping on the prison beds.

142.  The State of New Jersey has not given Ms. Wolf a speedy trial.

143.  The Bergen Prosecutor left the case in limbo for six months, then indicted Ms. Wolf at the time the case was to be dismissed, but this also coincides with a Feb 13, 2019 incident where Ms. Wolf asked Judge Melchionne to recuse himself and he retaliated.

144.  Moreover, New Jersey does not have jurisdiction, as the incident happened in North Carolina.  Ms. Wolf believes this is also politically motivated.

145.  Ms. Wolf is required to report to a probation officer once a month in person for the next five (5) years, even if there is no conviction.

146.  This forces Ms. Wolf into the State of New Jersey and affects her life and liberty.

147.  It also infringes upon her right to freedom of movement, all based on a case that started with a "custody" proceeding under N.J.S.A. 9:2-5 (which trafficks a non-resident, sole surviving parent and her children back into the State, through the family court system).

148.  Ms. Wolf is domiciled in Westchester County, New York and normally commutes about three hours round-trip to a full-time job in Manhattan.

149.  New Jersey is overzealous with keeping people in the state or otherwise tied to it; and this is the State manufacturing an "interest" without it being a compelling state interest.

150.  Ms. Wolf has been trying to extricate herself from the State of New Jersey for many years now; New Jersey's policies, practices, and laws keep her entangled there.

151.  On Oct. 1, 2018, Ms. Wolf had a court appearance in the FN and FD cases.

152. At court, Ms. Wolf asked for disability accommodations and modifications; Judge Melchionne refused, stating Ms. Wolf did not sign a HIPAA release.

153. As a result, Ms. Wolf could not fully and equally participate in the proceedings.

154. As a result, this exacerbated Ms. Wolf's PTSD.

155. At court, Ms. Wolf was provided with a copy of a report from Dr. Allwyn Levine, commissioned by the GAL for the children, Valerie Solimano, Esq.

156. Since Valerie Solimano was appointed by the court pursuant to N.J.S.A. 9:2-5, she is acting in a capacity on behalf of the State, for children who are wards of the state.

157. Dr. Levine does not have a contract with DCPP or the State of New Jersey.

158. By operation of law, the Defendants can't use Dr. Levine.

159. Dr. Levine is associated with NJ-AFCC.

160. In his report, Dr. Levine diagnoses (or attempts to) Ms. Wolf with a mental illness without ever having met and/or spoken to her.  This manifested bias and prejudice against Ms. Wolf as it stigmatizes her as having another disability.

161. In his report, Dr. Levine faults Ms. Wolf's "mental illness" for her political writings about corruption in the family court system in the State of New Jersey.

162. Dr. Levine made false and inaccurate statements about what the children said.

163. G told Dr. Levine that her stepmother was abusing and neglecting her.

164. Dr. Levine's report says G should live in foster care (with DCPP), or (classically) be shipped off to boarding school.

165. Dr. Levine's report says that the stepmother should control the kids' inheritance.

166. It is atypical for a mental health professional to make financial recommendations.

167. It is evident that the stepmother didn't want the child, nor was the so-called psychological mother, but just wanted the money, and this points to alignment and impropriety with the Dr. Levine.

168. The Court insists on using this discriminatory and unethical report in both the custody and DCPP proceedings.

169. This gun-for-hire tactic by Dr. Levine exacerbated Ms. Wolf's PTSD, which her medical doctor and ADA advocate Dr. Karin Huffer had cautioned the court about, predicating the need for a change of venue.

170. On or around October 24, 2018, Ms. Wolf had a court appearance.

171. Prior, on October 22, 2018, Ms. Wolf wrote and faxed a letter to Judge Melchionne requesting disability accommodations and modifications, namely for appointment of counsel in the FD custody case. (By that time, she had been appointed a public defender in her DCPP and criminal cases, on a financial basis only.)

172. Ms. Wolf stated to the Bergen Court that the FD custody case was a *de facto* adoption and had criminal implications and cited *Gideon v. Wainwright* (as she had indeed been arrested and incarcerated based on the August 24, 2018 order).

173. Judge Melchionne refused to appoint a public defender for Ms. Wolf in the custody case and refused disability accommodations and modifications.

174. As a result, Ms. Wolf could not fully and equally participate in the proceedings.

175. As a result, Ms. Wolf had to retain an attorney, Lou Lamatina, Esq., and pay an initial retainer of $10,000, which she had to borrow from her elderly mother. Lou Lamatina ultimately ran up a bill of about 100K.

176. This is contrary to the DCPP "permanency" proceedings dependent upon Ms. Wolf's ability to financially support her children and provide a stable home for them. (In fact, to date, Ms. Wolf and her mother have paid legal fees and costs equating to a down payment on a house.)

177. N.J.S.A. 30:4C-12 et seq. (Title 30, aka "Permanency") is based off ASFA and discriminates against women on the basis of sex and status as single mothers.

178. On or around November 28, 2018, Ms. Wolf had a court appearance.

179. The Bergen Court did not provide disability accommodations and modifications to Ms. Wolf.

180. As a result, Ms. Wolf could not fully and equally participate in the proceedings.

181. On November 28, 2018, Lou Lamatina told Ms. Wolf that Valerie Solimano (who is a mandated reporter) stated in chambers that Ms. Wolf's son D was suicidal.

182. Ms. Wolf became extremely upset at this, and the fact that the Court was prohibiting her from contact with her son at such a crucial time.

183. Ms. Wolf immediately called the family's social worker Lavar Parker, who informed Ms. Wolf that no one had reported this to them, but should have, given the gravity of the matter.

184. As a result, this exacerbated Ms. Wolf's PTSD.

185. On or around December 6, 2018, Ms. Wolf had a court appearance.

186. The Bergen Court did not provide disability accommodations and modifications to Ms. Wolf.

187. As a result, Ms. Wolf could not fully and equally participate in the proceedings.

188.   Moreover, Lou Lamatina, Esq. told Ms. Wolf that Judge Melchionne called her "crazy" in chambers on December 6, 2018, in front of court staff and about seven lawyers now involved in the case, in reaching an agreement regarding the children's inheritance.

189.   That same financial issue was the subject of the civilian criminal complaint Ms. Wolf had filed in May 2018 against Judge Melchionne, the GAL, and the stepmother.

190.   Judge Melchionne manifested bias and prejudice against Ms. Wolf, implying she has an unknown mental illness.  Moreover, it is retaliatory and coercive due to the criminal complaint Ms. Wolf had against Judge Melchionne.

191.   Judge Melchionne was therefore required to recuse himself.

192.   As a result, Ms. Wolf could not fully and equally participate in the proceedings.

193.   On or around January 24, 2019, Ms. Wolf brought up the disability-based discrimination, the ADA, Section 504, and U.S. Supreme Court jurisprudence to her attorney, Lou Lamatina, Esq.  Mr. Lamatina told her "Federal law does not apply."

194.   On or around January 24, 2019, by her attorney, Ms. Wolf re-documented her disability with the Court by providing it with a copy of a psychological evaluation she had done in December 2018, which stated she had PTSD (a psychiatric injury), but no mental illness.

195.   On or around February 8, 2019, Ms. Wolf had another court appearance for the same financial issue.

196.   Lou Lamatina, Esq. told Ms. Wolf that Judge Melchionne called her "crazy" in chambers *again* on February 8, 2018, in front of court staff and about seven lawyers.

197.   Again, Judge Melchionne manifested bias and prejudice against Ms. Wolf, implying she has an unknown mental illness.  It is retaliatory and coercive due to the criminal complaint Ms. Wolf filed against Judge Melchionne.

198. Again, Judge Melchionne was required to recuse himself.

199. Also, throughout the litigation, the stepmother's attorney, Jay Atkins, repeatedly made inflammatory and discriminating comments about Ms. Wolf's mental health in court proceedings that were open to the public.

200. The Bergen Court did not provide disability accommodations and modifications to Ms. Wolf.

201. As a result, Ms. Wolf could not fully and equally participate in the proceedings.

202. As a result, this exacerbated Ms. Wolf's PTSD.

203. On or around February 13, 2019, Ms. Wolf had another court appearance for the same financial issue, as well as the DCF case.

204. Ms. Wolf asked her attorneys to make a Motion to Recuse Judge Melchionne.

205. They refused; Lou Lamatina stated he did not want to provoke "Judge Melchionne's ire."

206. Prior to the hearing on February 13, 2019, Ms. Wolf sent a letter, in lieu of her attorneys, asking Judge Melchionne to recuse himself; withdrew her consent to a resolution regarding the life insurance policies for the children's Trust, refusing to sign; and called for the disqualification of Jay Atkins, Esq.; referencing threats and coercion under 42 U.S.C. § 12203 and judicial bias pursuant to N.J.S.A. 3.6 - Bias and Prejudice.

207. The culmination of the discrimination against Ms. Wolf prompted her to further exercise her right not to experience discrimination on the basis of disability, by refraining from any more court appearances in this hostile environment.

208. Judge Melchionne refused to recuse himself and retaliated by appointing a Guardian ad Litem (GAL) for Ms. Wolf, regarding Ms. Wolf as mentally incapacitated without any legitimate findings.

209. This contravenes a psychological evaluation of Ms. Wolf by Dr. Michelle Casarella, which she provided to the Court, which states Ms. Wolf has PTSD, but no mental illness.

210. Appointment of the GAL is also undue influence.

211. Ms. Wolf has repeatedly maintained that the Bergen Court does not have personal jurisdiction over her, nor subject matter jurisdiction.

212. Subject at the hearing, Jay Atkins and Luciana Coutinho-Crane had moved the court to appoint a GAL for Ms. Wolf, under N.J.S.A. 4:8-6 as if Ms. Wolf were mentally incapacitated.

213. N.J.S.A. 4:8-6 requires examination by two physicians who determine that the subject lacks the capacity to govern his or her affairs.

214. No physician has ever examined Ms. Wolf and determined her to be mentally incapacitated.

215. Thus, the motion did not meet the criteria.

216. Judge Melchionne then claimed he was appointing the GAL *sua sponte* pursuant to N.J.S.A. 4:26-2 which states:

> (b)(4) "…The court may appoint a guardian ad litem for a minor or **alleged mentally incapacitated person** on its own motion."

217. This GAL appointment was retaliatory as it came directly after Ms. Wolf refused to sign the financial resolution and asked Judge Melchionne to recuse himself for the discrimination.

218. Effectively, the case has been hijacked from Ms. Wolf as the GAL has veto power.

219. The Bergen Court did not provide Ms. Wolf with Informed Consent, nor any GAL handbook, guidelines, or parameters as to what GAL's can and cannot do.

220. Appointment of the GAL violates Ms. Wolf's right to privacy.

221. The Bergen Court did not provide disability accommodations and modifications to Ms. Wolf.

222. As a result, Ms. Wolf could not fully and equally participate in the proceedings.

223. As a result, this exacerbated Ms. Wolf's PTSD.

224. On or around February 15, 2019, Ms. Wolf fired her attorney Lou Lamatina.

225. Mr. Lamatina stated to Ms. Wolf that she no longer had the ability to fire him.

226. Despite Ms. Wolf's objections, Lou Lamatina remained as Ms. Wolf's attorney of record.

227. Ms. Wolf's life and liberty interests are at stake in the criminal matter, which is based off the FD custody case.

228. Ms. Wolf is forced to litigate with ineffective assistance of counsel in a matter that has criminal implications.

229. As a result, Ms. Wolf has been denied the opportunity to defend the case and preserve her constitutional rights.

230. As a result, Ms. Wolf cannot not fully and equally participate in the proceedings.

231. As a result, this exacerbated Ms. Wolf's PTSD.

232. Defendant Judge Peter J. Melchionne continued to hold court proceedings and issue orders against Ms. Wolf, without disability accommodations and modifications for Karin Wolf.

233. On or around March 12, 2019, Judge Melchionne issued orders suspending Ms. Wolf's parenting time with her daughter, barring her from contact with daughter, and demanding she turn over the child's U.S. passport; and signed an order for Ms. Wolf's arrest.

234. As a result, this exacerbated Ms. Wolf's PTSD.

235. On or around April 4, 2019, Judge Melchionne issued a default against Ms. Wolf and suppressed her pleadings in the FD custody matter.

236. On June 24 and 25, 2019, Ms. Wolf had court appearances for a trial.

237. Prior to trial, Ms. Wolf faxed Judge Melchionne chambers, the technical assistance manual published by the USDOJ and HHS in August 2015 entitled, *Protecting the Rights of Parents and Prospective Parents with Disabilities: Technical Assistance Manual for State and Local Child Welfare Agencies and Courts under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act.*

238. Judge Melchionne knew Ms. Wolf needed accommodations, wouldn't give them, and continued contravening her medical diagnosis and treatment. Judge Melchionne acted out of a discretionary capacity and a personal capacity.

239. On or around June 24 and 25, 2019, Judge Melchionne held a trial in the custody matter.

240. Judge Melchionne refused to let Ms. Wolf vacate the default.

241. Judge Melchionne refused to let Ms. Wolf appear telephonically or even listen to the proceedings. Judge Melchionne blocked communication between Ms. Wolf and her attorney and her GAL.

242. As a result, Ms. Wolf was effectively rendered deaf and dumb as she could not access the aural content of the proceedings, nor speak at the proceeding, nor communicate with her lawyer or GAL about the content of the proceedings.

243. The Bergen Court did not provide disability accommodations and modifications to Ms. Wolf.

244. As a result, Ms. Wolf could not fully and equally participate in the proceedings.

245. As a result, this exacerbated Ms. Wolf's PTSD.

**DCPP**

246. On or around September 5, 2018, DCPP removed G from her stepmother and Ms. Wolf, filing an application for "permanency" against the stepmother and Ms. Wolf regarding the minor child G only.

247. N.J.S.A. 30:4C-12 et seq. (Title 30, aka "Permanency") is based off ASFA and discriminates against women on the basis of <u>sex</u> and <u>status</u> as single mothers.

248. New Jersey does not have jurisdiction as Ms. Wolf is domiciled in New York and her children follow her domicile by operation of law.

249. There is no finding of abuse or neglect against Karin Wolf.

250. Kari Ferrare and Lavar Parker of DCPP initially stated to Ms. Wolf that all she had to do was take a psychological evaluation to get her daughter back.

251. On the contrary, DCPP refuses to place G back with Ms. Wolf until Ms. Wolf completes an overzealous laundry list of services (psychological evaluation, 12 weeks of parenting classes, therapy, therapeutic supervised visitation, etc.).

252. By law, DCPP is required to place a child with family first. G has repeatedly stated she wants to live with her mother, or her beloved maternal grandmother, known as 'Buela.

253. DCPP refuses to place G with her maternal grandmother in the interim unless she too undergoes a psychological evaluation, and this is coming from Lydia Tatekawa.

254. Instead, G is living in foster care with non-family at this point.

255. On September 5th, the stepmother stated she no longer wanted custody or reunification with G, and abandoned her claims as the "psychological mother/parent" of G.

256. The Bergen Court subsequently removed the stepmother as a defendant in the DCPP case.

257. Accordingly, the stepmother also amended her complaint in the FD custody case, dropping her claims identifying herself as the "psychological mother/parent" of G.

258. By operation of law, the amendment relates back for a mistake concerning the proper party's identity and standing, or lack thereof in this case.

259. DCPP did not make reasonable efforts to remove the child from the home.

260. Moreover, it provoked the situation by refusing to recognize Ms. Wolf's custody and guardianship of the children upon the father's death in April 2018; and by keeping Ms. Wolf's children in an abusive household with the stepmother, who is not a formal foster parent, nor adopted the children.

261. To date, D remains in the custody of Coutinho-Crane, who together with Valerie Solimano, poisons D against Ms. Wolf and G; and prevents the family from consortium.

262. The State of New Jersey appointed an attorney for Ms. Wolf from the Office of Parental Representation.

263. However, State policy and practice dictates that public defenders refrain from actions against the State, per the State's handbook for public defenders.

264. Thus, Ms. Wolf has not been afforded zealous representation by her appointed attorney, which raises an Equal Protection issue.

265. The public defender failed to assert Ms. Wolf's rights under the ADA.

266. The public defender failed to respond to DCPP's complaint in writing as Ms. Wolf requested.

267. The public defender failed to object to the removal of G from Ms. Wolf, as Ms. Wolf requested.

268.    DCPP files reports with the court shortly before court appearances (fundamentally a motion) to which Ms. Wolf is neither privy, nor able to respond in writing.

269.    Ms. Wolf's public defender told her that written responses to DCPP's Title 30 permanency application to the court, are neither customary, nor required.

270.    As a result, Ms. Wolf lost ground in preserving her rights, but moreover, this policy is coercive.

271.    Ms. Wolf never consented to services under Title 30, nor does she want or need them. She simply wants her children back and to be free from law, as is her fundamental right.

272.    There is no finding of abuse or neglect against Ms. Wolf.

273.    There was no fact-finding hearing prior to the State taking Ms. Wolf's children from her.

274.    Judge Melchionne ordered Ms. Wolf to sign HIPAA releases.

275.    DCPP waited about six months before taking G to the doctor to treat her Scoliosis.

276.    As a result, G's spine is damaged.

277.    As a result, this caused great anxiety in Ms. Wolf and exacerbated her PTSD.

278.    DCPP is not legitimately trying to reunify Ms. Wolf with her children.

279.    DCPP and the Bergen Court held a Child Placement Review Board hearing, without Notice to Ms. Wolf, as required, thus preventing her from attending.

280.    The Bergen Court denied Ms. Wolf's request for a new Child Placement Review Board hearing, depriving Ms. Wolf of a full, equal, and meaningful opportunity to be heard.

281.    DCPP also failed to timely notify Ms. Wolf of the Internal Placement Review (IPR), telling her only 24 hours prior).

282.    DCPP arranged a psychological evaluation of Ms. Wolf with Dr. Marc Singer, who is an ex-cop.

283. Dr. Singer interrogated Ms. Wolf about the underlying criminal matter, without a lawyer present, causing her to invoke her Fifth Amendment right and leave abruptly.

284. DCPP insists on perverting and skewing the psychological evaluation by providing Dr. Singer and other psychological evaluators with the biased report from Dr. Levine.

285. Moreover, Dr. Levine's report was arrived at under dubious circumstances in the illegitimate custody case (FD), triggering the doctrine of *fruit of the poisonous tree*.

286. Ms. Wolf documented her PTSD and Asthma disabilities with DCPP by providing a 2013 diagnosis from her psychologist, a 2017 letter from her medical doctor, and the 2018 Declaration and curriculum vitae from Dr. Karin Huffer.

287. DCPP refuses to accept that Ms. Wolf has PTSD.

288. DCPP is on a "fishing expedition."

289. DCPP stated to Ms. Wolf and G that Ms. Wolf's PTSD diagnosis was from 2013 and that she may not have it anymore. PTSD is not curable.

290. On or around December 15, 2018, Ms. Wolf had a new independent psychological evaluation done by Dr. Michelle Casarella in New York, where Ms. Wolf lives.

291. Ms. Wolf provided Dr. Michelle Casarella's report to DCPP and the Bergen Court.

292. Dr. Casarella's report states that Ms. Wolf has PTSD (injury), but no mental illness.

293. DCPP refuses to honor Dr. Casarella's report because it is out-of-state; and because they could not provide Dr. Casarella with Dr. Levine's report.

294. Dr. Casarella made a recommendation that Ms. Wolf attend therapy with a female therapist whom she trusts. This extends to any psychologist who would do a psychological evaluation.

295. Contrary to this, DCPP keeps sending her to males.

296. At DCPP's request, the Bergen Court ordered Ms. Wolf into therapy where she has no privacy or confidentiality; and is ordered to sign HIPAA releases.

297. Accordingly, Ms. Wolf refused therapy.

298. Moreover, DCPP faulted Ms. Wolf in the Court proceedings for not complying with therapy.

299. G's therapist through DCPP told G that G has PTSD several times.

300. Ms. Wolf asked to see G's medical records, as is her right.

301. DCPP has not provided Ms. Wolf with her child's medical records.

302. DCPP not only failed to document to Ms. Wolf that her child has PTSD, but "spun it" by chastising Ms. Wolf, accusing her of interfering with therapy, and threatening to Court.

303. G has repeatedly stated to DCPP and the Court that she wants to live with her mother, and that being separated from her is causing great emotional distress.

304. This exacerbates the child's condition.

305. DCPP does not follow Court orders, which are based on their own applications.

306. Lydia Tatekawa threatened Ms. Wolf with putting her daughter up for adoption, mentioning ASFA timeframes, yet DCPP delayed schedule services it is requiring Ms. Wolf to complete, and this is intentional.

307. DCPP failed to schedule therapeutic visitation in a timely manner, thus causing delay and depriving Ms. Wolf and her daughter G time together.

308. DCPP failed to timely schedule parenting classes, causing delay.  Moreover, Ms. Wolf repeatedly asked about parenting classes, which take 12 weeks to complete.

309. In contrast, DCPP immediately scheduled parenting classes with the foster parents (Ms. Wolf's brother and sister-in-law) and those classes only last about 4 weeks.

310. This raises an Equal Protection issue.

311. DCPP refused to schedule family team meetings, as required.

312. DCPP refuses to hold the stepmother accountable for her abuse and neglect of G (contrary to Connecticut proceedings).

313. While Ms. Wolf's criminal case has been pending, Lydia Tatekawa has repeatedly tried to convince G that Ms. Wolf "kidnapped" her, despite G telling her she ran away, thus tampering with a witness as a State actor. (Ms. Wolf was not charged with kidnapping, but rather, *custodial interference*.)

314. DCPP has repeatedly used the technique of 'morphic resonance' to label and stigmatize Ms. Wolf as having a mental illness.

315. DCPP has repeatedly stated to G that her mother needs a psychological evaluation and therapy, and otherwise given G the impression her mother has a mental illness, namely Bipolar Disorder.

316. DCPP has repeatedly stated to G that her mother needs a parenting classes, and otherwise undermined Ms. Wolf's parenting of her teenage daughter.

317. DCPP is also stigmatizing Ms. Wolf to her son D, and this is being done in concert with Luciana Coutinho-Crane.

318. Lydia Tatekawa has repeatedly implied to Ms. Wolf's other family members that Ms. Wolf has a mental illness, namely Bipolar Disorder.

319. Lydia Tatekawa has repeatedly labeled Ms. Wolf as having Bipolar Disorder, when communicating with and contracting professionals for services such as therapeutic supervised visitation.

320.    On or around June 24, 2019, Ms. Wolf sent her attorney and GAL in the DCF case, an
        email attachment of the technical assistance manual published by the USDOJ and HHS in
        August 2015 entitled, *Protecting the Rights of Parents and Prospective Parents with
        Disabilities: Technical Assistance Manual for State and Local Child Welfare Agencies
        and Courts under Title II of the Americans with Disabilities Act and Section 504 of the
        Rehabilitation Act.*

321.    On or around June 27, 2019, Ms. Wolf made a request for new counsel in the DCF case
        to the Head of the Office of Parental Representation, Joseph Preziosi, Esq., who was
        hostile to Ms. Wolf, and stated to her (paraphrasing) that "parents don't have rights under
        the ADA in DCF proceedings."

### Administrative Office of the Courts (AOC)

322.    On June 10 and 17, 2019, Plaintiff Karin Wolf wrote and sent a letter and addendum via
        fax and certified mail, to Glenn Grant and David Tang of the AOC, citing disability-
        based discrimination and retaliation by the Bergen Court; and called for Judge
        Melchionne's removal as the judge in her cases; and other relief.

323.    Glenn Grant and David Tang did not respond.

324.    On or around June 24, 2019, Ms. Wolf called Glenn Grant's office to follow up and left a
        message with his secretary.

325.    Mr. Grant did not return the call.

### Requests for Reimbursement

326.    Defendants exploited Ms. Wolf and her children, and profited from it.

327.    As a result of the foregoing, Plaintiffs have been forced to pay for the litigation, at an
        approximate cost of $300,000.

33

**Required Application of the Greatly Expanded ADA**
**(Amendments Act of 2008 and Final Rule of 2016)**

328.  Defendants removed Ms. Wolf's children from her based on perceived mental

impairments and stereotypes; and Ms. Wolf's PTSD and assumptions about this mental

impairment.  Moreover, their actions, inactions, and omissions were life-threatening,

coercive, retaliatory, and exploitative.

329.  PTSD is listed under "predictable assessments" under the ADA and its implementing

regulation.  Plaintiff's disabilities must be assessed without regard to mitigating

measures.

330.  Ms. Wolf is not required to accept any individualized treatment.

331.  Because the actions complained of herein occurred from 2017 – present, the greatly

expanded definition of the ADA Amendments Act of 2008, Final Rule of 2016, and

parallel State law changes apply.

332.  Ms. Wolf's PTSD and chronic Asthma disabilities fall under actual mental

impairment/psychiatric injury and physiological impairment, which substantially limit

one or more major life activities.  Ms. Wolf has records of such impairments.

333.  G's Scoliosis and PTSD disabilities fall under actual mental impairment/psychiatric

injury and physiological impairment, which substantially limit one or more major life

activities.  Ms. Wolf has records of such impairments.

334.  Plaintiffs' perceived disabilities fall under the greatly expanded *regarded as* prong of the

ADA.  Ms. Wolf has court records of such perceived mental impairments.

335.  *Major life activities* and *substantial limitations* are to be construed as broadly as possible

under the ADAAA and its implementing regulations.

336.  Under the ADAAA, "major life activities" include "major bodily functions."

337.    Plaintiffs do not have to identify any major life activity or bodily functions that are substantially limited, under the ADAAA and its implementing regulations.

338.    Each day that passes adds incremental harm.  Ms. Wolf's and G's PTSD cannot be treated until the ongoing trauma ends.  A mitigating measure and remedy require the restoration of the children to their mother Ms. Wolf, making the family whole again.

339.    Defendants have failed to mitigate the harm they have done to Plaintiffs.

340.    Unmitigated harm is a continuing cause of action.

341.    Ms. Wolf fighting for her children is a major life activity.

342.    It is unreasonable to expect Plaintiffs to be subject to the jurisdiction of the State of New Jersey under the UCCJEA or PKPA, and the State should cede to mitigate further harm.

### COUNT I
### (AMERICANS WITH DISABILITIES ACT)
### (Karin Wolf)

343.    The preceding paragraphs are realleged and reasserted as if fully set forth here.

344.    Karin Wolf is an individual with PTSD and chronic Asthma; and <u>regarded</u> by the Defendants as having a mental illness.

345.    Ms. Wolf wanted to have equal access to court proceedings where her parental rights, her children's reciprocal rights to their mother, and the children's property interests were at stake; accordingly, she is a qualified individual with a disability as defined in 42 U.S.C. § 12131.

346.    Defendants are a State government and a department, agency, or other instrumentality of a State government, and/or are licensed; accordingly, Defendants are public and/or private entities as defined in 42 U.S.C. § 12131(1) and 42 U.S.C. § 12181.

347. Defendant Luciana Coutinho-Crane is a layperson who acted in concert with the public and private entities herein.

348. 28 C.F.R. § 35.134 Retaliation or coercion, provides:

(a) No private or public entity shall discriminate against any individual because that individual has opposed any act or practice made unlawful by this part, or because that individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the Act or this part.

(b) No private or public entity shall coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by the Act or this part.

349. 28 C.F.R. § 36.206 Retaliation or coercion, provides:

(a) No private or public entity shall discriminate against any individual because that individual has opposed any act or practice made unlawful by this part, or because that individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the Act or this part.

(b) No private or public entity shall coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by the Act or this part.

(c) Illustrations of conduct prohibited by this section include, but are not limited to:

> (1) Coercing an individual to deny or limit the benefits, services, or advantages to which he or she is entitled under the Act or this part;

> (2) Threatening, intimidating, or interfering with an individual with a disability who is seeking to obtain or use the goods, services, facilities, privileges, advantages, or accommodations of a public accommodation;

> (3) Intimidating or threatening any person because that person is assisting or encouraging an individual or group entitled to claim the rights granted or protected by the Act or this part to exercise those rights; or

> (4) Retaliating against any person because that person has participated in any investigation or action to enforce the Act or this part."

350.   Title II of the ADA, 42 U.S.C. § 12132, provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

351.   Title III of the ADA, 42 U.S.C. § 12182, provides that: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation."

352.   Title III of the ADA, 42 U.S.C. § 12182(b)(1)(A)(ii), provides that: "It shall be discriminatory to afford an individual or class of individuals, on the basis of a disability

or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements with the opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is not equal to that afforded to other individuals."

353. Defendants are subject to both Title II and Title III of the ADA because of contractual arrangements.

354. Defendants have discriminated intentionally against Ms. Wolf in violation of Title II and III of the ADA, 42 U.S.C. § 12131 and 42 U.S.C. § 12181, by refusing to provide individualized treatment, auxiliary aids and services, and other accommodations and modifications necessary to ensure an equal opportunity for Ms. Wolf to participate in Defendants' programs and activities; and by using retaliation and coercion tactics against Ms. Wolf to exploit her disability.

355. Defendant Luciana Coutinho-Crane has discriminated intentionally against Ms. Wolf by acting in concert with the public and private entities herein, to falsely accuse Ms. Wolf of being unfit and having a mental illness, exploit Ms. Wolf's PTSD, and retaliate against Ms. Wolf for her political activities; accordingly, she is in violation of the ADA as a **private individual**.

356. The analogy is found in *The Americans with Disabilities Act, Title II Technical Assistance Manual Covering State and Local Government Programs and Services,* states with examples:

> **II-3.11000 Retaliation or coercion.** Individuals who exercise their rights under the ADA, or assist others in exercising their rights, are protected from retaliation. The prohibition against retaliation or coercion **applies broadly to any individual**

or entity that seeks to prevent an individual from exercising his or her rights or to retaliate against him or her for having exercised those rights. Any form of retaliation or coercion, including threats, intimidation, or interference, is prohibited if it interferes with the exercise of rights under the Act.

ILLUSTRATION 1: A, a **private individual**, harasses X, an individual with cerebral palsy, in an effort to prevent X from attending a concert in a State park. A has violated the ADA.

ILLUSTRATION 2: A State tax official delays a tax refund for M, because M testified in a title II grievance proceeding involving the inaccessibility of the tax information office. The State has illegally retaliated against M in violation of title II. (See: https://www.ada.gov/taman2.htm)

357.   Defendants discriminated intentionally per the following implementing regulations:

  a.   continually segregating Plaintiffs from each other based on disability in violation of 28 C.F.R. § 35.130;

  b.   subjecting Ms. Wolf to disparate treatment (Title 30 permanency) as opposed to Luciana Coutinho-Crane's abuse and neglect of G (Title 9 abuse and neglect), in violation of 28 C.F.R. § 35.139(b);

  c.   retaliating against Plaintiffs in violation of 28 C.F.R. § 35.134;

  d.   stigmatizing and stereotyping Ms. Wolf with a mental illness, also on the basis of sex/gender, and repeatedly acting on assumptions about Ms. Wolf's actual disabilities and perceived disabilities in violation of 28 C.F.R. § 35.130(h); and 28 C.F.R. § 36.301(b);

e.  stigmatizing Ms. Wolf in court proceedings and other services, in violation of 28
C.F.R. § 35.130 (b)(1)(v) and (b)(3); and 28 C.F.R. § 36.301;

f.  denying Plaintiffs the opportunity to participate in or benefit from Defendants'
services, programs, activities, facilities, privileges, advantages, and
accommodations in violation of 28 C.F.R. § 35.130(b)(1)(i); and 28 C.F.R. §§
36.201, 36.202, and 36.203;

g.  denying Plaintiffs an opportunity to participate in or benefit from Defendants'
services, programs, activities, facilities, privileges, advantages, and
accommodations that is not equal to that afforded to others, in violation of 28
C.F.R. § 35.130(b)(1)(ii); and 28 C.F.R. §§ 36.201, 36.202;

h.  limiting Plaintiffs in the enjoyment of the rights, privileges, advantages, or
opportunities enjoyed by others, in violation of 28 C.F.R. § 35.130(b)(1)(vii); and
28 C.F.R. §§ 36.201, 36.202;

i.  utilizing criteria or methods of administration that had the effect of subjecting an
individual with a disability to discrimination on the basis of disability or that have
the purpose or effect of defeating or substantially impairing accomplishment of
the objectives of Defendants' services, programs, and activities with respect to
individuals with disabilities, in violation of 28 C.F.R. § 35.130(b)(3); and 28
C.F.R. §§ 36.301(a) and 36.204;

j.  selecting vendors, forcing/coercing Plaintiffs into, and entering into, contractual
arrangements to be used to evaluate Plaintiffs' mental health that had the effect of
excluding Plaintiffs from, denying them the benefits of, or otherwise subjecting
them to discrimination and disparate treatment, or that have the purpose or effect

of defeating or substantially impairing the accomplishment of the objectives of
Defendants' services, programs, and activities with respect to individuals with
disabilities, in violation of 28 C.F.R. § 35.130 (b)(1)(v) and (b)(4); and 28 C.F.R.
§§ 36.201, 36.202, and 36.203;

k.   failing to make reasonable modifications in policies, practices, or procedures
when the modifications are necessary to avoid discrimination on the basis of
disability, unless the Defendants can demonstrate that making the modifications
would fundamentally alter the nature of the service, program, or activity, in
violation of 28 C.F.R. § 35.130(b)(7); and 28 C.F.R. § 36.302;

l.   failing to administer Defendants' services, programs, and activities in the most
integrated setting appropriate to the needs of persons with disabilities, in violation
of 28 C.F.R. § 35.130(d); and 28 CFR § 36.203;

m.   failing to operate Defendants' services, programs, activities, and facilities so that,
when viewed in its entirety, it is readily accessible to and usable in the most
integrated setting appropriate, in violation of 28 C.F.R. §§ 35.150 and 35.151; and
28 C.F.R. § 36.203;

n.   refusing to offer and provide appropriate individualized treatment and
accommodations necessary to ensure full and equal opportunity for Ms. Wolf and
her children to participate in Defendants' programs, services, and activities;

o.   excluding or otherwise denying equal services, programs, or activities to an
individual or entity because of the known disability of an individual with whom
the individual or entity is known to have a relationship or association, in violation
of 28 C.F.R. § 35.130(g).

358.   As a result of Defendants' actions and inactions, Ms. Wolf has been injured and suffered pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses.

## COUNT II
### (AMERICANS WITH DISABILITIES ACT)
### (D and G)

359.   The preceding paragraphs are realleged and reasserted as if fully set forth here.

360.   D and G, Ms. Wolf's children, through their Trust accounts, were forced to pay for legal fees, Guardian ad Litem fees, custody evaluations, and other costs associated with court proceedings where their mother was denied equal access.  Moreover, Defendants exploited the family to enrich themselves.  As a result, they have been discriminated against on the basis of their association with an individual with a qualified disability.

361.   Defendants are a State government and a department, agency, or other instrumentality of a State government, and/or are licensed; accordingly, Defendants are public and/or private entities as defined in 42 U.S.C. § 12131(1) and 42 U.S.C. § 12181.

362.   Defendant Luciana Coutinho-Crane is a layperson who acted in concert with the public and private entities herein.

363.   28 C.F.R. 35.130(g) provides: "A public entity shall not exclude or otherwise deny equal services, programs, or activities, to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association."

364.   28 C.F.R. § 36.205 provides: "A public accommodation shall not exclude or otherwise deny equal goods, services, facilities, privileges, advantages, accommodations, or other

opportunities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association."

365. Defendants have discriminated intentionally against D and G in violation of Title II and III of the ADA by refusing to provide individualized treatment, auxiliary aids and services, and other accommodations and modifications necessary to ensure an equal opportunity for their mother to participate in Defendants' programs and activities; and by using retaliation and coercion tactics against their mother to exploit her disability.

366. As a result of Defendants' actions and inactions, Ms. Wolf and her children D and G have been injured and suffered pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses.

## COUNT III
## (AMERICAN WITH DISABILITIES ACT)
## (G)

367. The preceding paragraphs are realleged and reasserted as if fully set forth here.

368. G is an individual with Scoliosis and PTSD.

369. G needed proper, timely, individualized medical treatment; accordingly, she is a qualified individual with a disability as defined in 42 U.S.C. § 12131.

370. G's father was diagnosed with terminal cancer, hospitalized, and died; accordingly, he was a qualified individual with a disability as defined in 42 U.S.C. § 12131, and G further qualifies as a person associated with an individual with a qualified disability.

371. Defendants have discriminated intentionally against G in violation of Title II and III of the ADA, 42 U.S.C. § 12131 and 42 U.S.C. § 12181, by refusing to provide proper, timely, individualized medical treatment for her Scoliosis, which resulted in spinal

43

damage. Moreover, Defendants, in concert with one another, physically abused a disabled child.

372. Defendants have also discriminated intentionally against G in violation of Title II and III of the ADA, 42 U.S.C. § 12131 and 42 U.S.C. § 12181, by failing to inform her mother of her father's grave condition and death, blocking her mother from her fundamental right to be cared for by her mother. Moreover, Defendants exploited G's disability for their own financial interests, protecting their jobs, and attempting to shield themselves from liability, without concern for the child's health and well-being.

373. As a result, G has been discriminated against on the basis of her disability and on the basis of her association with an individual with a qualified disability.

374. As a result of Defendants' actions and inactions, G has been injured and suffered pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses.

**COUNT IV**
**(AMERICAN WITH DISABILITIES ACT)**
**(Karin Wolf)**

375. The preceding paragraphs are realleged and reasserted as if fully set forth here.

376. Karin Wolf, by her daughter G, and by her former husband Edward Crane; qualifies as a person associated with an individual with a qualified disability.

377. Defendants have discriminated intentionally against Karin Wolf in violation of Title II and III of the ADA, 42 U.S.C. § 12131 and 42 U.S.C. § 12181, by refusing to provide proper, timely, individualized medical treatment to her daughter for Scoliosis, which resulted in spinal damage. Moreover, Defendants, in concert with one another, physically abused a disabled child, causing Ms. Wolf great anxiety and grief.

378. Defendants have also discriminated intentionally against Karin Wolf in violation of Title II and III of the ADA, 42 U.S.C. § 12131 and 42 U.S.C. § 12181, by failing to inform Ms. Wolf of her former husband's grave condition and death, blocking her from exercising her fundamental right to care for her child.  Moreover, Defendants exploited G's disability for their own financial interests, protecting their jobs, and attempting to shield themselves from liability, without concern for the child's health and well-being.

379. As a result, Karin Wolf has been discriminated against on the basis of her association with an individual with a qualified disability.

380. As a result of Defendants' actions and inactions, Karin Wolf has been injured and suffered pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses.

## COUNT V
## (REHABILITATION ACT)
## (Karin Wolf)

381. The preceding paragraphs are realleged and reasserted as if fully set forth here.

382. Karin Wolf is an individual with PTSD and chronic Asthma; and regarded by the Defendants as having a mental illness; who wanted to have equal access to court proceedings; accordingly, she is a qualified individual with a disability as defined in 42 U.S.C. § 12131.

383. Defendants are recipients of federal financial assistance.

384. Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, provides that no qualified individual with a disability, solely by the reason of his or her disability, may "be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

45

385.   Defendants have discriminated intentionally against Ms. Wolf by refusing to provide
individualized treatment, auxiliary aids and services, and other accommodations and
modifications necessary to ensure an equal opportunity for Ms. Wolf to participate in
Defendants' programs and activities; and by using retaliation and coercion tactics against
Ms. Wolf to exploit her disability in those programs and services; in violation of Section
504 of the Rehabilitation Act, 29 U.S.C. § 794.

386.   Defendants have discriminated intentionally against Karin Wolf by refusing to provide
proper, timely, individualized medical treatment to her daughter for Scoliosis, which
resulted in spinal damage.  Moreover, Defendants, in concert with one another, physically
abused a disabled child, causing Ms. Wolf great anxiety and grief.

387.   Defendants have also discriminated intentionally against Karin Wolf by failing to inform
Ms. Wolf of her former husband's grave condition and death, blocking her from
exercising her fundamental right to care for her child.  Moreover, Defendants exploited
G's disability for their own financial interests, protecting their jobs, and attempting to
shield themselves from liability, without concern for the child's health and well-being.

388.   As a result of Defendants' actions and inactions, Ms. Wolf has been injured and suffered
pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of
enjoyment of life, and other nonpecuniary losses.

## COUNT VI
### (REHABILITATION ACT)
### (D and G)

389.   The preceding paragraphs are realleged and reasserted as if fully set forth here.

390.   D and G, as Ms. Wolf's children, through their trust fund, were forced to pay for
litigation where Defendants exploited them and their mother, and profited from it; as a

result, they have been discriminated against on the basis of their association with an individual with a disability.

391. Defendants are recipients of federal financial assistance.

392. Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, provides that no qualified individual with a disability, solely by the reason of his or her disability, may "be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

393. Defendants have discriminated intentionally against D and G by refusing to provide their mother with individualized treatment, auxiliary aids and services, and other accommodations and modifications necessary to ensure an equal opportunity for their mother to participate in Defendants' programs and activities; and by using retaliation and coercion tactics against Ms. Wolf to exploit her disability in those program and activities; in violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

394. Defendants have discriminated intentionally against G by refusing to provide proper, timely, individualized medical treatment for her Scoliosis, which resulted in spinal damage. Moreover, Defendants, in concert with one another, physically abused a disabled child.

395. Defendants have also discriminated intentionally against G by failing to inform her mother of her father's grave condition and death, blocking her mother from her fundamental right to be cared for by her mother. Moreover, Defendants exploited G's disability for their own financial interests, protecting their jobs, and attempting to shield themselves from liability, without concern for the child's health and well-being.

396.  As a result of Defendants' actions and inactions, Ms. Wolf has been injured and suffered pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses.

## DECLARATORY RELIEF & INJUNCTIVE RELIEF

397.  The preceding paragraphs are realleged and reasserted as if fully set forth here.

398.  The damage to Plaintiffs includes the irreparable injury of destruction of the family unit and exploitation in state court proceedings violating their constitutional and due process rights that can never be regained unless this court stays the unlawful proceedings.

399.  The state court proceedings must be immediately stayed pursuant to the federal anti-injunction statute as this is a 42 U. S. C. §1983 suit in equity before this court which authorizes this court to redress the deprivations ongoing in the state court.

400.  Plaintiffs rely on U.S. Supreme Court jurisprudence including, but not limited to, *Griswold v. Connecticut, Santosky v. Kramer, Troxel v. Granville, Gideon v. Wainwright,* and *Strickland v. Washington.*

### Prayer for Relief

WHEREFORE, Plaintiffs demand judgment against the Defendants for the following:

401.  That this Court appoint an attorney for the Plaintiffs;

402.  To declare that Defendants have violated Title II of the ADA, 42 U.S.C. §12131 *et seq.,* and its implementing regulation, 28 C.F.R. Part 35; Title III of the ADA, 42 U.S.C. §12181 *et seq.,* and its implementing regulation, 28 C.F.R. Part 36; and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794;

403.  To enjoin the Defendants, their officers, agents and employees, and all other persons in active concert or participation with Defendants, as well as any successors or assigns,

from engaging in discriminatory, retaliatory, and coercive policies and practices against individuals based on their disabilities, and specifically from failing or refusing to take appropriate steps to ensure compliance with the requirements of Title II of the ADA, 42 U.S.C. § 12131 *et seq.*, and its implementing regulations, 28 C.F.R. Part 35; Title III of the ADA, 42 U.S.C. § 12181 *et seq.*, and its implementing regulations, 28 C.F.R. Part 36, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794;

404.   That the Defendants modify their policies, practices, and procedures as necessary to bring them into compliance with Title II of the ADA, 42 U.S.C. § 12131 *et seq.*, and its implementing regulations, 28 C.F.R. Part 35; Title III of the ADA, 42 U.S.C. § 12181 *et seq.*, and its implementing regulations, 28 C.F.R. Part 36; and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794;

405.   That the Defendants, their agents and successors in office, and all persons acting in concert with the Defendants to promptly remedy the demonstrated violations of Title II and Title III of the ADA and its implementing regulation; and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794; and mitigate harm to Plaintiffs;

406.   For the immediate return of D and G to their mother Karin Wolf;

407.   Granting political asylum to Plaintiffs from the State of New Jersey;

408.   To terminate Defendants' federal financial assistance;

409.   To assess a civil penalty against defendants as authorized by 42 U.S.C. § 12188(b)(2)(C) to vindicate the public interest;

410.   To reimburse Plaintiffs for the expenses they incurred;

411.   To award compensatory damages to Plaintiffs;

412.   To award punitive damages to Plaintiffs;

413.   To award Plaintiffs' attorney's fees and costs;

414.   Such other appropriate relief as the interests of justice require.

### JURY DEMAND

Plaintiffs hereby demand a trial by jury of all issues so triable.


Respectfully submitted,


Karin Wolf, citizen in party
and as mother, natural guardian, and
next friend of D and G
40 Village Green, #219
Bedford, NY 10506
Phone: (201) 450-2192
Email: karinelenawolf@gmail.com

July 9, 2019

Date

JS 44C/SDNY
REV. 06/01/17

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for use of the Clerk of Court for the purpose of initiating the civil docket sheet.

**PLAINTIFFS**
Karin Wolf, et al.

**DEFENDANTS**
State of New Jersey, et al.

**ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

**ATTORNEYS (IF KNOWN)**

**CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE)
(DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

Americans with Disabilities Act 42 U.S.C. §§ 12131-12134, Rehabilitation Act 29 U.S.C. § 794; discrimation based on disability;

Has this action, case, or proceeding, or one essentially the same been previously filed in SDNY at any time? No[✓]Yes[ ]     Judge Previously Assigned

If yes, was this case   Vol.[ ] Invol.[ ]   Dismissed.  No[ ] Yes[ ]   If yes, give date _____ & Case No. _____

**IS THIS AN INTERNATIONAL ARBITRATION CASE?**          No [✓]     Yes [ ]

*(PLACE AN [x] IN ONE BOX ONLY)*          **NATURE OF SUIT**

| | TORTS | | | ACTIONS UNDER STATUTES |
|---|---|---|---|---|
| **CONTRACT** | **PERSONAL INJURY** | **PERSONAL INJURY** | **FORFEITURE/PENALTY** | **BANKRUPTCY** |

**CONTRACT**
[ ] 110   INSURANCE
[ ] 120   MARINE
[ ] 130   MILLER ACT
[ ] 140   NEGOTIABLE INSTRUMENT
[ ] 150   RECOVERY OF OVERPAYMENT & ENFORCEMENT OF JUDGMENT
[ ] 151   MEDICARE ACT
[ ] 152   RECOVERY OF DEFAULTED STUDENT LOANS (EXCL VETERANS)
[ ] 153   RECOVERY OF OVERPAYMENT OF VETERAN'S BENEFITS
[ ] 160   STOCKHOLDERS SUITS
[ ] 190   OTHER CONTRACT
[ ] 195   CONTRACT PRODUCT LIABILITY
[ ] 196   FRANCHISE

**REAL PROPERTY**
[ ] 210   LAND CONDEMNATION
[ ] 220   FORECLOSURE
[ ] 230   RENT LEASE & EJECTMENT
[ ] 240   TORTS TO LAND
[ ] 245   TORT PRODUCT LIABILITY
[ ] 290   ALL OTHER REAL PROPERTY

**PERSONAL INJURY**
[ ] 310 AIRPLANE
[ ] 315 AIRPLANE PRODUCT LIABILITY
[ ] 320 ASSAULT, LIBEL & SLANDER
[ ] 330 FEDERAL EMPLOYERS' LIABILITY
[ ] 340 MARINE
[ ] 345 MARINE PRODUCT LIABILITY
[ ] 350 MOTOR VEHICLE
[ ] 355 MOTOR VEHICLE PRODUCT LIABILITY
[ ] 360 OTHER PERSONAL INJURY
[ ] 362 PERSONAL INJURY - MED MALPRACTICE

**PERSONAL INJURY**
[ ] 367 HEALTHCARE/ PHARMACEUTICAL PERSONAL INJURY/PRODUCT LIABILITY
[ ] 385 PERSONAL INJURY PRODUCT LIABILITY
[ ] 368 ASBESTOS PERSONAL INJURY PRODUCT LIABILITY

**PERSONAL PROPERTY**
[ ] 370 OTHER FRAUD
[ ] 371 TRUTH IN LENDING
[ ] 380 OTHER PERSONAL PROPERTY DAMAGE
[ ] 385 PROPERTY DAMAGE PRODUCT LIABILITY

**PRISONER PETITIONS**
[ ] 463 ALIEN DETAINEE
[ ] 510 MOTIONS TO VACATE SENTENCE 28 USC 2255
[ ] 530 HABEAS CORPUS
[ ] 535 DEATH PENALTY
[ ] 540 MANDAMUS & OTHER

**PRISONER CIVIL RIGHTS**
[ ] 550 CIVIL RIGHTS
[ ] 555 PRISON CONDITION
[ ] 560 CIVIL DETAINEE CONDITIONS OF CONFINEMENT

**ACTIONS UNDER STATUTES**

**CIVIL RIGHTS**
[ ] 440 OTHER CIVIL RIGHTS (Non-Prisoner)
[ ] 441 VOTING
[ ] 442 EMPLOYMENT
[ ] 443 HOUSING/ ACCOMMODATIONS
[ ] 445 AMERICANS WITH DISABILITIES - EMPLOYMENT
[✓] 446 AMERICANS WITH DISABILITIES -OTHER
[ ] 448 EDUCATION

**FORFEITURE/PENALTY**
[ ] 625 DRUG RELATED SEIZURE OF PROPERTY 21 USC 881
[ ] 690 OTHER

**PROPERTY RIGHTS**
[ ] 820 COPYRIGHTS
[ ] 830 PATENT
[ ] 835 PATENT-ABBREVIATED NEW DRUG APPLICATION
[ ] 840 TRADEMARK

**LABOR**
[ ] 710 FAIR LABOR STANDARDS ACT
[ ] 720 LABOR/MGMT RELATIONS
[ ] 740 RAILWAY LABOR ACT
[ ] 751 FAMILY MEDICAL LEAVE ACT (FMLA)
[ ] 790 OTHER LABOR LITIGATION
[ ] 791 EMPL RET INC SECURITY ACT (ERISA)

**IMMIGRATION**
[ ] 462 NATURALIZATION APPLICATION
[ ] 465 OTHER IMMIGRATION ACTIONS

**BANKRUPTCY**
[ ] 422 APPEAL 28 USC 158
[ ] 423 WITHDRAWAL 28 USC 157

**SOCIAL SECURITY**
[ ] 861 HIA (1395ff)
[ ] 862 BLACK LUNG (923)
[ ] 863 DIWC/DIWW (405(g))
[ ] 864 SSID TITLE XVI
[ ] 865 RSI (405(g))

**FEDERAL TAX SUITS**
[ ] 870 TAXES (U.S. Plaintiff or Defendant)
[ ] 871 IRS-THIRD PARTY 28 USC 7609

**OTHER STATUTES**
[ ] 375 FALSE CLAIMS
[ ] 376 QUI TAM
[ ] 400 STATE REAPPORTIONMENT
[ ] 410 ANTITRUST
[ ] 430 BANKS & BANKING
[ ] 450 COMMERCE
[ ] 460 DEPORTATION
[ ] 470 RACKETEER INFLU- ENCED & CORRUPT ORGANIZATION ACT (RICO)
[ ] 480 CONSUMER CREDIT
[ ] 490 CABLE/SATELLITE TV
[ ] 850 SECURITIES/ COMMODITIES/ EXCHANGE
[ ] 890 OTHER STATUTORY ACTIONS
[ ] 891 AGRICULTURAL ACTS
[ ] 893 ENVIRONMENTAL MATTERS
[ ] 895 FREEDOM OF INFORMATION ACT
[ ] 896 ARBITRATION
[ ] 899 ADMINISTRATIVE PROCEDURE ACT/REVIEW OR APPEAL OF AGENCY DECISION
[ ] 950 CONSTITUTIONALITY OF STATE STATUTES

*Check if demanded in complaint:*

[ ] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $_____   OTHER _____

*Check YES only if demanded in complaint*
JURY DEMAND: [✓] YES [ ] NO

DO YOU CLAIM THIS CASE IS RELATED TO A CIVIL CASE NOW PENDING IN S.D.N.Y. AS DEFINED BY LOCAL RULE FOR DIVISION OF BUSINESS 13?
IF SO, STATE:

JUDGE _____   DOCKET NUMBER _____

NOTE: You must also submit at the time of filing the Statement of Relatedness form (Form IH-32).

*(PLACE AN  x  IN ONE BOX ONLY)*                                          **ORIGIN**

☐ 1 Original      ☐ 2 Removed from    ☐ 3 Remanded    ☐ 4 Reinstated or    ☐ 5 Transferred from    ☐ 6 Multidistrict    ☐ 7 Appeal to District
    Proceeding        State Court        from       Reopened        (Specify District)      Litigation       Judge from
                                   Appellate                                  (Transferred)      Magistrate Judge
        ☐ a.  all parties represented      Court

        ☐ b.  At least one party                                         ☐ 8 Multidistrict Litigation (Direct File)
            is pro se.

*(PLACE AN  x  IN ONE BOX ONLY)*         **BASIS OF JURISDICTION**         *IF DIVERSITY, INDICATE*
☐ 1 U.S. PLAINTIFF    ☐ 2 U.S. DEFENDANT    ☑ 3 FEDERAL QUESTION    ☐ 4 DIVERSITY        *CITIZENSHIP BELOW.*
                                      (U.S. NOT A PARTY)

### CITIZENSHIP OF PRINCIPAL PARTIES (FOR DIVERSITY CASES ONLY)

(Place an [X] in one box for Plaintiff and one box for Defendant)

| | PTF | DEF | | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|---|---|---|
| CITIZEN OF THIS STATE | [ ] 1 | [ ] 1 | CITIZEN OR SUBJECT OF A FOREIGN COUNTRY | [ ] 3 | [ ] 3 | INCORPORATED and PRINCIPAL PLACE OF BUSINESS IN ANOTHER STATE | [ ] 5 | [ ] 5 |
| CITIZEN OF ANOTHER STATE | [ ] 2 | [ ] 2 | INCORPORATED or PRINCIPAL PLACE OF BUSINESS IN THIS STATE | [ ] 4 | [ ] 4 | FOREIGN NATION | [ ] 6 | [ ] 6 |

PLAINTIFF(S) ADDRESS(ES) AND COUNTY(IES)

Karin Wolf, 40 Village Green, #219, New York, 10506

DEFENDANT(S) ADDRESS(ES) AND COUNTY(IES)

State of New Jersey, Christopher S. Porrino, New Jersey Attorney General, Richard J. Hughes Justice Complex, 25 Market Street, Trenton, New Jersey 08625.

DEFENDANT(S) ADDRESS UNKNOWN
REPRESENTATION IS HEREBY MADE THAT, AT THIS TIME, I HAVE BEEN UNABLE, WITH REASONABLE DILIGENCE, TO ASCERTAIN THE RESIDENCE ADDRESSES OF THE FOLLOWING DEFENDANTS:

### COURTHOUSE ASSIGNMENT

I hereby certify that this case should be assigned to the courthouse indicated below pursuant to Local Rule for Division of Business 18, 20 or 21.

Check one:    THIS ACTION SHOULD BE ASSIGNED TO:      ☐ WHITE PLAINS      ☐ MANHATTAN

DATE           SIGNATURE OF ATTORNEY OF RECORD         ADMITTED TO PRACTICE IN THIS DISTRICT
                                                  [ ] NO
RECEIPT #                                              [ ] YES (DATE ADMITTED  Mo. _____  Yr. _____)
                                                 Attorney Bar Code #

Magistrate Judge is to be designated by the Clerk of the Court.

Magistrate Judge _____ is so Designated.

Ruby J. Krajick, Clerk of Court by _____ Deputy Clerk, DATED _____.

UNITED STATES DISTRICT COURT (NEW YORK SOUTHERN)

Clear Form        Save        Print